Rick L. BRADLEY, Plaintiff,

v.

J.E. VAL–MEJIAS, M.D., et al., Defendants.

Civil Action No. 00–2395–GTV.

United States District Court, D. Kansas.

Nov. 6, 2002.

Jeffrey D. Zimmerman, Shawnee, KS, Jim Leventhal, James E Puga, Natalie Brown, Leventhal & Brown, P.C., Denver, CO, for Plaintiff.

Jack Focht, Jay F. Fowler, Amy S. Lemley, Shannon D. Wead, Foulston Siefkin LLP, Wichita, KS, Timothy M. Aylward, Horn, Aylward & Bandy LLC, Kansas City, MO, for Defendants.

## MEMORANDUM AND ORDER

VANBEBBER, Senior District Judge.

Plaintiff, Rick L. Bradley, brings this medical malpractice action against Defendants, J.E. Val–Mejias, M.D. ("Dr.Val–Mejias") and The Galichia Medical Group, P.A. ("GMED"). The case is before the court on GMED's motion to dismiss (Doc. 23), GMED's motion for Rule 11 sanctions against Jeff Zimmerman and Natalie Brown (Doc. 26), GMED's first motion for summary judgment (Doc. 169), Plaintiff's motion to disqualify Amy S. Lemley and the law firm of Foulston Siefkin LLP (Doc. 183), Plaintiff's motion for leave to file a second amended complaint (Doc. 204), and Dr. Val–Mejias's first and GMED's second

motion for summary judgment (Doc. 212). For the reasons set forth below, GMED's motion to dismiss (Doc. 23) is granted, GMED's motion for Rule 11 sanctions (Doc. 26) is denied, GMED's first motion for summary judgment (Doc. 169) is denied as moot, Plaintiff's motion to disqualify defense counsel (Doc. 183) is denied as moot, Plaintiff's motion for leave to file a second amended complaint (Doc. 204) is denied, and Dr. Val–Mejias's first and GMED's second motion for summary judgment (Doc. 212) is granted in part and denied as moot in part.

## I. FACTUAL BACKGROUND

The following facts are taken from the motions for summary judgment submitted in this case. As such, they are either uncontroverted or viewed in the light most favorable to Plaintiff. Immaterial facts and facts not properly supported by the record are omitted. Plaintiff, a forty-seven year-old man, had his first pacemaker installed in 1981. He became a patient of GMED, located in Wichita, Kansas, in approximately 1988. On September 24, 1992, Dr. Demosthenis Klonis, a cardiac surgeon employed by GMED, performed a procedure upgrading Plaintiff's pacemaker. Dr. Val–Mejias, who was also employed by GMED, assisted Dr. Klonis in the procedure.

In August 1993, Plaintiff began experiencing problems with his pacemaker after he was involved in an automobile accident. As a result of the problems, Dr. Klonis replaced Plaintiff's pacemaker in a surgical procedure performed on September 16, 1993. Dr. Val–Mejias was not involved in the second procedure.

For several years after the 1993 pacemaker replacement, Plaintiff's contact with GMED personnel or physicians was limited to several instances in which he telephoned in to GMED to transmit basic pacemaker data to be read and evaluated by a machine. Such telephone contacts are noted in Plaintiff's medical records on December 12, 1994, June 15, 1995, and February 10, 1997.

In March 1997, Plaintiff quit his job working as a truck driver. During that month and the following month, Plaintiff saw a series of doctors, including Dr. T.K. Reddy of Hutchinson, Kansas, Dr. J.S. Spitzer of Hutchinson, Kansas, and Dr. Gregory Boxberger of GMED. Plaintiff consulted Drs. Reddy and Boxberger for complaints generally related to chest pain, left arm numbness, dizziness, clammy skin and blurred vision. Plaintiff visited Dr. Spitzer for his yearly Department of Transportation ("DOT") physical exam, which he passed. The specific details of Plaintiff's visits with those doctors are not pertinent to this opinion.

Plaintiff also maintains that he visited Dr. Val–Mejias in March 1997, and that Dr. Val–Mejias denied Plaintiff's DOT certification at that time. Although Defendants deny that Plaintiff visited Dr. Val–Mejias then, the court will assume for purposes of this opinion that the visit occurred.

Plaintiff also had appointments with Dr. Val–Mejias on May 2, 1997 and June 16, 1997. On June 16, 1997, Dr. Val–Mejias diagnosed Plaintiff with vertigo, which he attributed to an inner ear problem, and shingles (herpes zoster), which he believed was the cause of the numbness on the left side of Plaintiff's body. Dr. Val–Mejias indicated that he did not believe that Plaintiff's problems had a cardiac origin or were in any way related to his pacemaker. He referred Plaintiff to Dr. Gary Pease, an ear, nose, and throat specialist, for further evaluation.

Dr. Pease saw Plaintiff on July 14, 1997. The medical records from the visit indicate that Dr. Pease diagnosed Plaintiff with vertigo of undetermined etiology. Plaintiff

has testified, however, that Dr. Pease told him that he thought the vertigo was heart-related. In addition, Plaintiff's wife has testified that Dr. Pease told them the following: "He thought that, off the record, basically what he told us, he thought it was probably related back to the heart or he suggested we could got [sic] to a neurologist." Plaintiff testified that he never went to a neurologist because he thought it would be a "waste of time and a waste of money." Plaintiff's wife testified that Plaintiff never went to a see a neurologist and never returned to Dr. Val–Mejias because the couple did not have enough money to pay their medical bills.

Despite his wife's testimony about not returning to Dr. Val–Mejias after the appointment with Dr. Pease, Plaintiff maintains that he had an appointment with Dr. Val–Mejias as late as November 1997. Although Defendants contend that Plaintiff's last visit with Dr. Val–Mejias was in June 1997, the court will assume for purposes of this opinion that the November 1997 visit occurred.

On April 29, 1998, Plaintiff testified under oath and while represented by an attorney at a hearing before an administrative law judge on a claim he filed for Social Security Disability and Supplemental Security Income benefits. At the hearing, Plaintiff testified that he stopped working in March 1997 because of "dizzy spells," "numbness," "not feeling good," and "poor judgment." Plaintiff described many of his symptoms at length, including the fact that his pacemaker caused him pain and shocked him. He stated that every time he went to Dr. Val–Mejias, Dr. Val–Mejias would adjust the pacemaker and the symptoms would come on stronger, and that when he would tell Dr. Val–Mejias this, Dr. Val–Mejias would adjust the pacemaker again but the symptoms would never disappear. Ultimately, Plaintiff testified as follows: "I got off the road because I

didn't feel I was safe. I still [feel] it's due to the pacemaker. I don't think they got something in there set right or they are not going deep enough in it and I don't think they're paying a lot of attention to me because of my financial situation."

On May 6, 1998, Plaintiff saw Dr. Candice Morgan of Greeley, Colorado for a second opinion regarding his pacemaker and cardiac problems. After examining Plaintiff, Dr. Morgan completed a report in which she stated that she believed: (1) the ventricular lead of Plaintiff's pacemaker was causing chest muscle stimulation and probable stimulation to the nerve in his left arm, which resulted in pain, numbness and weakness in the arm; (2) poor ventricular sensing in the pacemaker could be causing Plaintiff's lightheadedness; and (3) there were multiple problems with the pacemaker's programming and functions which could explain some of Plaintiff's symptoms. Dr. Morgan noted that she made some programming changes to Plaintiff's pacemaker and then discussed with Plaintiff the options available to him. Dr. Morgan described the options as being "either to continue as he is and replace ventricular lead when present pacemaker is at end of life, which may be a number of years, [or] replace the ventricular lead at this time to allow normal ventricular pacing and sensing without the present problems and high thresholds and poor sensing plus muscle and nerve stimulation."

Plaintiff returned to Dr. Morgan the following day for an evaluation of the effect of the programming changes on his pacemaker. Dr. Morgan's report of the second appointment described "[m]ild improvement in overall symptoms with ventricular lead still firing occasionally" and "an episode of awakening in his sleep around 3:00 AM." Dr. Morgan recommended another pacemaker evaluation in six months.

On September 3, 1998, Plaintiff again saw Dr. Morgan after being admitted to a Colorado hospital with chest pain. At that time, Dr. Morgan reviewed x-rays taken of Plaintiff's chest and opined that a fractured ventricular lead in Plaintiff's pacemaker was the most likely cause of Plaintiff's continuing symptoms. Dr. Morgan informed Plaintiff of her opinion and replaced his pacemaker shortly thereafter.

GMED, Dr. Val–Mejias, and Dr. Klonis are all qualified health care providers pursuant to Kansas law.

## II. PROCEDURAL BACKGROUND

Plaintiff filed his original complaint in this case on September 1, 2000. In his original complaint, Plaintiff advances medical malpractice and fraudulent concealment claims against Dr. Val–Mejias, a medical malpractice claim against Dr. Klonis, and medical malpractice claims against GMED. Plaintiff's medical malpractice claims against GMED are based solely on the allegedly negligent actions of Drs. Val–Mejias and Klonis.

On March 26, 2001, GMED filed a motion to dismiss Plaintiff's claims against it (Doc. 23). GMED's motion is based on the argument that the Kansas Health Care Stabilization Act, K.S.A. § 40–3403(h), prohibits a qualified health care provider, such as GMED, from being held vicariously liable for the actions of other qualified health care providers, such as Drs. Val–Mejias and Klonis. In conjunction with its motion to dismiss, GMED also filed a motion for Rule 11 sanctions against Plaintiff's counsel (Doc. 26). GMED argues that sanctions are appropriate because Plaintiff's counsel failed to make a reasonable inquiry into the facts and law prior to filing the complaint and because they refused to immediately dismiss the claims against GMED once they became aware that all of the Defendants were qualified health care providers under Kansas law.

In response to GMED's motion to dismiss, Plaintiff filed a motion for leave to file a first amended complaint (Doc. 35). The proposed first amended complaint deleted the two vicarious liability claims against GMED but added a direct liability claim against GMED based on general allegations of improper treatment of Plaintiff. Defendants argued that because all of the allegations against GMED in the proposed first amended complaint related to the medical care of Plaintiff, the claim was really only a disguised vicarious liability claim and was, accordingly, frivolous and made in bad faith.

On October 15, 2001, Plaintiff and Dr. Klonis stipulated to Dr. Klonis's dismissal with prejudice (Doc. 116). The court entered an order to that effect the following day (Doc. 117).

On January 7, 2002, GMED filed its first motion for summary judgment (Doc. 169), in which it again argues that it cannot be held vicariously liabile under K.S.A. § 40–3403(h) for the actions of Drs. Val–Mejias and Klonis. In addition, GMED argues that it is entitled to summary judgment on Plaintiff's direct liability claim against it in the proposed first amended complaint because: (1) that proposed complaint contains no allegations that any non-physician employees of GMED acted negligently; and (2) Plaintiff has provided no expert testimony that GMED or its non-physician employees departed from the standard of care or caused Plaintiff's injuries.

On February 15, 2002, Plaintiff filed a motion to disqualify defense counsel, Amy Lemley, and her firm, Foulston Siefkin LLP (Doc. 183). Plaintiff alleges that Ms. Lemley and her law firm have a conflict of interest because they represent Dr. Val–Mejias and GMED, as well as Dr. Boxberger, a GMED physician against whom Defendants have represented that they will

attempt to attribute fault to should this case proceed to trial.

On March 18, 2002, the court held a hearing on the pending motions. The court took under advisement GMED's motion to dismiss (Doc. 23), GMED's motion for Rule 11 sanctions (Doc. 26), and GMED's motion for summary judgment (Doc. 169). The court denied Plaintiff's motion for leave to file a first amended complaint (Doc. 35). In doing so, the court found that the allegations in the proposed first amended complaint merely advanced a vicarious liability claim against GMED. However, the court granted Plaintiff additional time to file another motion for leave to amend after Plaintiff's counsel represented at the hearing that Plaintiff's direct liability claim against GMED is to be based on allegedly faulty recordkeeping by GMED's non-physician employees. The court declined to rule on the motion to disqualify Ms. Lemley and Foulston Siefkin LLP (Doc. 183) because the motion was not yet ripe at the time of the hearing.

On March 27, 2002, Plaintiff filed a motion for leave to file a second amended complaint (Doc. 204). The proposed second amended complaint deletes the claim against and references to Dr. Klonis, deletes the two vicarious liability claims against GMED, adds additional allegations against Dr. Val–Mejias, and adds a direct liability claim against GMED for negligence in the creation, management, retention, and maintenance of Plaintiff's medical records.

Finally, on April 29, 2002, Dr. Val–Mejias and GMED jointly filed a motion for summary judgment (Doc. 212). In this final motion for summary judgment, Defendants argue that Plaintiff's medical malpractice claims are barred by the statutes of repose and limitations, that Plaintiff's fraudulent concealment claim against Dr. Val–Mejias is invalid, and that Plaintiff has failed to state a cognizable direct liability claim against GMED in his proposed second amended complaint.

## III. DISCUSSION

### A. GMED's Motion to Dismiss (Doc. 23)

GMED moves under Fed.R.Civ.P. 12(b)(6) to dismiss the two claims against it in Plaintiff's original complaint on the basis that the Kansas Health Care Stabilization Act, K.S.A. § 40–3403(h), prohibits a qualified health care provider, such as GMED, from being held vicariously liable for the actions of other qualified health care providers, such as Drs. Val–Mejias and Klonis. In support of its motion, GMED references the Notice of Filing of Affidavit of Insurance (Doc. 21), which contains an affidavit from Rita Noll, Chief Attorney for the Kansas Health Care Stabilization Fund, confirming that GMED, Dr. Val–Mejias, and Dr. Klonis are all qualified health care providers under the fund. The court took GMED's motion under advisement at the hearing held on March 18, 2002, and now grants it.

■ The court begins by noting that, for purposes of a motion to dismiss, GMED's reference to Ms. Noll's affidavit constitutes submission of materials outside the pleading. "If, on a [Rule 12(b)(6) motion], matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Fed.R.Civ.P. 12(b). The court finds that all parties have been given reasonable opportunity to submit any relevant evidence pertaining to the health care stabilization act issue; therefore, the court considers GMED's motion to dismiss as one

**1248**

for summary judgment pursuant to Rule 56.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). The requirement of a "genuine" issue of fact means that the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue of fact is "material" if it is essential to the proper disposition of the claim. *Id.* Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. 2505.

■ The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). This burden may be met by showing that there is a lack of evidence to support the non-moving party's case. *Id.* at 325, 106 S.Ct. 2548. Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to show that there is a genuine issue of material fact left for trial. *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505. "[A] party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Id.* The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Id.* "Any evi-

dence tending to show triable issues will be viewed in the light most favorable to the nonmoving party." *Black Hills Aviation, Inc. v. United States,* 34 F.3d 968, 972 (10th Cir.1994) (citation omitted).

K.S.A. § 40–3403(h) provides, in pertinent part:

A health care provider who is qualified for coverage under the fund shall have no vicarious liability or responsibility for any injury or death arising out of the rendering of or the failure to render professional services inside or outside this state by any other health care provider who is also qualified for coverage under the fund.

It is uncontroverted that GMED, Dr. Val–Mejias, and Dr. Klonis are all qualified health care providers under the fund. It is also undisputed that Plaintiff's claims against GMED in the second and fifth claims for relief in his original complaint are based entirely on a theory that GMED can be held vicariously liable for the actions of Drs. Val–Mejias and Klonis. Given this, the court grants summary judgment to GMED on Plaintiff's second and fifth claims for relief in his original complaint.

**B. GMED's Motion for Rule 11 Sanctions (Doc. 26)**

In conjunction with its motion to dismiss, GMED also filed a motion for sanctions pursuant to Fed.R.Civ.P. 11 against Plaintiff's counsel, Jeff Zimmerman and Natalie Brown. GMED argues that sanctions are appropriate because Plaintiff's counsel failed to make a reasonable inquiry into the facts and law prior to filing the complaint and because they refused to immediately dismiss the claims against GMED once they became aware that all Defendants were qualified health care providers under Kansas law. The court took GMED's motion under advisement at the March 18, 2002 hearing. After further

consideration, the court does not believe that Rule 11 sanctions are appropriate in this instance and, therefore, denies GMED's motion.

### C. GMED's First Motion for Summary Judgment (Doc. 169)

GMED also moves for summary judgment under the same theory as it did in its motion to dismiss, namely, that it cannot be held vicariously liable under the Kansas Health Care Stabilization Act for the actions of Drs. Val–Mejias and Klonis. In addition, GMED argues that it is entitled to summary judgment on the direct liability claim that Plaintiff advanced against GMED in his proposed first amended complaint. Like the motion to dismiss and the motion for Rule 11 sanctions, the court took GMED's first motion for summary judgment under advisement at the hearing held on March 18, 2002. Because the court has already granted GMED's motion to dismiss (Doc. 23) on the health care stabilization act issue, and because the court denied Plaintiff's motion for leave to file a first amended complaint (Doc. 35) at the March 18 hearing, the court denies GMED's first motion for summary judgment as moot.

### D. Dr. Val–Mejias's First and GMED's

### Second Motion for Summary Judgment (Doc. 212)

Dr. Val–Mejias's first and GMED's second motion for summary judgment asserts that Plaintiff's medical malpractice claims are barred by the Kansas statutes of repose and limitations, that Plaintiff's fraudulent concealment claim against Dr. Val–Mejias is invalid, and that Plaintiff has failed to state a cognizable direct liability claim against GMED in his proposed second amended complaint. The court applies the summary judgment standards previously articulated in Section III.A. of this opinion.

### 1. Medical Malpractice Claims

In Kansas, medical malpractice actions are governed by a two-year statute of limitations and a four-year statute of repose. K.S.A. § 60–513(a)(7), (c); *Swafford v. Wortman,* 2 F.Supp.2d 1429, 1433 (D.Kan. 1998). K.S.A. § 60–513 provides, in pertinent part:

(a) The following actions shall be brought within two years:

. . . .

(7) An action arising out of the rendering of or failure to render professional services by a health care provider, not arising on contract.

. . . .

(c) A cause of action arising out of the rendering or the failure to render professional services by a health care provider shall be deemed to have accrued at the time of the occurrence of the act giving rise to the cause of action, unless the fact of injury is not reasonably ascertainable until some time after the initial act, then the period of limitation shall not commence until the fact of injury becomes reasonably ascertainable to the injured party, but in no event shall such an action be commenced more than four years beyond the time of the act giving rise to the cause of action.

#### a. Dr. Val–Mejias

The court begins with an analysis of Plaintiff's medical malpractice claim against Dr. Val–Mejias. Plaintiff's liability expert witness, Dr. Charles Love, filed a report on October 21, 2001, setting forth the following alleged departures from care by Dr. Val–Mejias:

1) It was not reasonable in a relatively young patient to reuse the current and only marginally functioning unipolar pacing lead on the new pacemaker in 1992.

2) Repair of the pacing system with a new ventricular lead should have been performed after the motor vehicle accident in 1993 when the patient's symptoms worsened significantly.

3) Replacement of only the pacemaker (2022T sn 104128) on 16 September 1993 was not sufficient to rectify the patient's problem that was due to a malfunction of the ventricular pacing lead, nor was the pacemaker defective in any way.

4) On 11 September 1993, the new pacemaker was placed on a unipolar lead with a high capture threshold, making it necessary to use high outputs and thus stimulate the chest wall and pectoralis muscle. This resulted in pain and chronic problems for the patient.

5) Use of this high threshold lead resulted in the need for excessive output voltages and pulse width that would cause rapid battery depletion and the need for replacement much sooner than if a new lead had been used.

6) The unipolar ventricular lead also had marginal sensing at 4mV, making it more likely that myopotential inhibition would occur at the nominal 2mV sensitivity setting where the pacemaker was left.

7) Failure to replace the lead at that time and failure to recognize this at [sic] the problem resulted in the disabling symptoms Mr. Bradley experienced from that time until replacement of the ventricular lead in 1998 under the direction of Dr. Morgan.

By the end of 1997 when all of the diagnostic testing had been done, these issues were evident. Failure of Dr. Val–Mejias to recognize these signs and symptoms, and failure to act upon them by correcting the pacemaker lead problem were the direct cause of the problems this patient continued to have. The standard of care was to fix the ventricular lead, which would have resolved the problems for the patient.

Defendants first contend that the four-year statute of repose bars Plaintiff's medical malpractice claim against Dr. Val–Mejias to the extent that it concerns any of the first six alleged departures from the standard of care outlined by Dr. Love. Specifically, Defendants argue that all six alleged departures relate directly to actions taken during Plaintiff's pacemaker operations in September 1992 and September 1993. Because nearly seven to eight years separates those operations from the date that Plaintiff filed suit in this case, September 1, 2000, Defendants urge the court to apply the statute of repose to those alleged departures. Plaintiff does not challenge the lapse of time between the two operations and the commencement of this action. Given the seven to eight year lapse in time, the court agrees that to the extent that Plaintiff's medical malpractice claim against Dr. Val–Mejias is based on Dr. Love's first six alleged departures from the standard of care, it appears, on its face, to be barred by the Kansas four-year statute of repose. However, for reasons discussed in more detail below, the court refrains from granting summary judgment to Dr. Val–Mejias based solely on statute of repose grounds.

Defendants next argue that the two-year statute of limitations bars Plaintiff's medical malpractice claim against Dr. Val–Mejias to the extent that it concerns the final alleged departure from care outlined by Dr. Love, which presumably covers any visits Plaintiff made with Dr. Val–Mejias after the two surgeries in 1992 and 1993 through his last alleged visits in 1997. As noted, K.S.A. § 60–513(c) provides that a medical malpractice cause of action accrues at the time of the act giving rise to the cause of action, or if the fact of injury is not reasonably ascertainable at the time

of the initial act, at the time when the fact of injury becomes reasonably ascertainable. Kansas courts have defined the phrase "reasonably ascertainable" to mean that once an injury is known to be substantial, the injured party has a duty to reasonably investigate to determine whether the injury was caused by negligence. *Kelley v. Barnett*, 23 Kan.App.2d 564, 932 P.2d 471, 476–77 (1997). To determine whether the fact of injury was reasonably ascertainable, the court must apply an objective standard based on an examination of all of the surrounding circumstances. *P.W.P. v. L.S.*, 266 Kan. 417, 969 P.2d 896, 901–02 (1998) (citations omitted). To prevail on summary judgment, the defendant must demonstrate as a matter of law that there is an absence of evidence to support Plaintiff's contention that the fact of his injury could not be reasonably ascertained more than two years before filing suit. See *Hecht v. First Nat'l Bank & Trust Co.*, 208 Kan. 84, 490 P.2d 649, 656 (1971) (holding that when there is conflicting evidence on when an injury became reasonably ascertainable, the question becomes one for the trier of fact).

■ Here, Defendants focus on the sworn testimony Plaintiff provided at his Social Security hearing on April 29, 1998, as well as the information he obtained from Dr. Morgan during his appointments with her on May 6 and 7, 1998, to show that Plaintiff's injury was reasonably ascertainable to him more than two years prior to the date he filed his original complaint in this case, September 1, 2000. At the April 1998 hearing, Plaintiff testified that he stopped working in March 1997 because of "dizzy spells," "numbness," "not feeling good," and "poor judgment." He described many of his symptoms at length, including the fact that his pacemaker caused him pain and shocked him. He stated that every time he went to Dr. Val–Mejias, Dr. Val–Mejias would adjust the pacemaker and the symptoms would come

on stronger, and that when he would tell Dr. Val–Mejias this, Dr. Val–Mejias would adjust the pacemaker again but the symptoms would never disappear. Ultimately, Plaintiff testified as follows: "I got off the road because I didn't feel I was safe. I still [feel] it's due to the pacemaker. I don't think they got something in there set right or they are not going deep enough in it and I don't think they're paying a lot of attention to me because of my financial situation."

During his appointments with Dr. Morgan in May 1998, Plaintiff learned that Dr. Morgan believed: (1) the ventricular lead of Plaintiff's pacemaker was causing chest muscle stimulation and probable stimulation to the nerve in his left arm, which resulted in pain, numbness and weakness in the arm; (2) poor ventricular sensing in the pacemaker could be causing Plaintiff's lightheadedness; and (3) there were multiple problems with the pacemaker's programming and functions which could explain some of Plaintiff's symptoms. At the time, Dr. Morgan described Plaintiff's options as being "either to continue as he is and replace ventricular lead when present pacemaker is at end of life, which may be a number of years, [or] replace the ventricular lead at this time to allow normal ventricular pacing and sensing without the present problems and high thresholds and poor sensing plus muscle and nerve stimulation."

Applying an objective standard based on an examination of all of the surrounding circumstances, the court determines that Plaintiff's testimony at the hearing and the evidence regarding the information he received from Dr. Morgan is sufficient to demonstrate as a matter of law that the fact of Plaintiff's injury was reasonably ascertainable to him more than two years prior to the date he filed suit in this case. The court concludes that there is no con-

flicting evidence on this issue sufficient to deny summary judgment to Dr. Val–Mejias. In addition, the court notes that because all seven alleged departures from care outlined by Dr. Love ultimately pertain to the same injury, i.e., the physical problems Plaintiff experienced as a result of his pacemaker, the statute of limitations operates to bar the entirety of Plaintiff's medical malpractice claim against Dr. Val–Mejias.

Although Plaintiff presents several arguments urging the court to conclude that the statutes of repose and limitations do not bar Plaintiff's medical malpractice claim, the court finds the arguments largely unavailing. First, Plaintiff argues that the statute of limitations did not begin to run until September 3, 1998, the date he gained actual knowledge that he had a fractured ventricular lead in his pacemaker. Despite his intimation to the contrary, "actual knowledge" is not the standard by which the court determines when the statute of limitations begins to run. As noted, the statute of limitations begins to run at the time of the act giving rise to the cause of action, or if the fact of injury is not reasonably ascertainable at the time of the initial act, at the time when the injury becomes reasonably ascertainable. K.S.A. § 60–513(c). The fact that Plaintiff did not have actual knowledge of the precise nature or the extent of his injury until September 3, 1998, does not negate the evidence that the fact of his injury was reasonably ascertainable to him by April or May 1998, more than two years before he filed suit in this case. See *Benne v. Int'l Bus. Machs. Corp.*, 87 F.3d 419, 427 (10th Cir.1996) (holding that the plaintiff's knowledge that her injury was somehow associated with the defendant, not her knowledge of the exact scientific nature of her injury, commenced the running of the statute of limitations); *P.W.P.*, 969 P.2d at 902 (citations omitted) ("[O]bjective knowledge of the injury, not the extent of the

injury, triggers the statute both in medical and nonmedical malpractice cases."); *Kelley*, 932 P.2d at 477 ("If plaintiffs were allowed to wait to commence suit until directly confronted with evidence of negligence, the statute of limitations would almost never begin to run.").

Plaintiff also argues that the statute of limitations is not triggered when a plaintiff is "lulled into confidence" to forego further investigation. In this case, Plaintiff contends that Dr. Val–Mejias "lulled him into confidence" by telling him on June 16, 1997 that his problems were not related to his pacemaker. Although the court agrees with Plaintiff that a defendant's inaccurate representations regarding a plaintiff's injury may delay the triggering of the statute of limitations, any such delay ceases once the fact of injury becomes reasonably ascertainable to the plaintiff. Because the court has already concluded that the fact of Plaintiff's injury became reasonably ascertainable to him by April or May 1998, the fact that Dr. Val–Mejias may have "lulled him into confidence" for a period of time after June 16, 1997 is irrelevant and an insufficient basis to deny summary judgment to Dr. Val–Mejias on statute of limitations grounds.

On a similar note, Plaintiff also maintains Dr. Val–Mejias should be equitably estopped from raising the statutes of repose and limitations as defenses because he fraudulently concealed information regarding his and Dr. Klonis's alleged negligence in this case. In *Robinson v. Shah*, the Kansas Court of Appeals held that a defendant may be equitably estopped from raising the defenses of the statute of limitations and the statute of repose in a medical malpractice action "where the defendant's own fraudulent concealment has resulted in the delay in discovering the defendant's wrongful actions." 23 Kan. App.2d 812, 936 P.2d 784, 798 (1997) (cita-

tion omitted). The Robinson court clarified, however, that a defendant would not be equitably estopped from raising either defense if the plaintiff discovered the wrong within sufficient time to permit the filing of the action within the statute of limitations or the statute of repose. *Id.* at 796–97 (citing *McCoy v. Wesley Hosp. & Nurse Training Sch.*, 188 Kan. 325, 362 P.2d 841, 846–47 (1961)). Even though the court holds in Section III.D.2 below that Plaintiff's fraudulent concealment claim against Dr. Val–Mejias is itself barred by the statute of limitations, the court provides the following analysis of Plaintiff's equitable estoppel argument.

Here, Plaintiff's original complaint maintains that Dr. Val–Mejias fraudulently concealed information from him during the period from March 5, 1997 to June 16, 1997. Plaintiff's proposed second amended complaint, which the court will address in more detail in Section III.E below, expands the dates to "[p]rior to and between March 5, 1997, and June 16, 1997, and thereafter to at least November 1997." It is clear from Plaintiff's pleadings and response to Defendants' motion for summary judgment that he alleges that Dr. Val–Mejias fraudulently concealed information from him on June 16, 1997 when Dr. Val–Mejias told Plaintiff that there was nothing wrong with his pacemaker. What is not clear, however, is exactly when Plaintiff contends the fraudulent concealment began and for how long it lasted. If the alleged fraudulent concealment began shortly after the September 1992 and September 1993 surgeries and lasted for four years or more, then equitable estoppel could operate to prohibit Dr. Val–Mejias from raising the statute of repose defense with respect to Dr. Love's first six alleged departures from care. Given this, the court will simply assume without deciding that an equitable estoppel argument against Dr. Val–Mejias's statute of repose defense may be valid. Therefore, the court will not grant summary judgment to Dr. Val–Mejias based on the statute repose defense.

Dr. Val–Mejias does not face the same difficulty with the statute of limitations defense. The court has already concluded that the fact of Plaintiff's injury became reasonably ascertainable to him by April or May 1998. Since any concealment on the part of Dr. Val–Mejias ceased to operate at that time, Plaintiff should have filed his complaint by April or May 2000. Because Plaintiff could have filed his complaint within the appropriate time limits, but did not, equitable estoppel is not an appropriate doctrine for him to raise, and the statute of limitations bars his entire medical malpractice claim against Dr. Val–Mejias.

### b. GMED

Defendants also move for summary judgment on the medical malpractice claim Plaintiff advances against GMED in his proposed second amended complaint. Because the court determines in Section III.E below that Plaintiff's motion for leave to file his second amended complaint (Doc. 204) must be denied as futile, the court denies Defendants' motion for summary judgment as to that claim as moot.

### 2. Fraudulent Concealment Claim

Finally, Defendants also move for summary judgment on Plaintiff's claim against Dr. Val–Mejias for fraudulent concealment. Although Defendants advance several different arguments in support of summary judgment on the claim, the court concludes that, like Plaintiff's medical malpractice claims, the claim is barred on statute of limitations grounds.

█ The statute of limitations on a claim for fraud in Kansas is two years. K.S.A. § 60–513(a)(3). As is the case for medical malpractice actions, a cause of action for a fraud claim accrues at the time

that the act giving rise to the cause of action first causes substantial injury, or if the fact of injury is not reasonably ascertainable until some time after the initial act, at the time when the fact of injury becomes reasonably ascertainable. Id. § 60–513(b). The court has already concluded that the fact of Plaintiff's medical malpractice injury was reasonably ascertainable to him by April or May 1998. By the same token, the court concludes that the fact of Dr. Val–Mejias's alleged fraud in concealing such injury was, as a matter of law, likewise reasonably ascertainable to Plaintiff by April or May 1998. In other words, once it became reasonably ascertainable to Plaintiff that Dr. Val–Mejias may have acted negligently in his medical care of Plaintiff, it also became reasonably ascertainable that Dr. Val–Mejias may have attempted to conceal his negligence. Because Plaintiff did not file suit until more than two years after the fact of the alleged fraud was reasonably ascertainable, Plaintiff's fraudulent concealment claim is barred by the statute of limitations, and the court grants summary judgment to Dr. Val–Mejias on that basis.

As a final note, the court recognizes Plaintiff's argument that summary judgment is inappropriate as to all of these claims until Plaintiff has had an opportunity to conduct full discovery on the claims. The court disagrees. Plaintiff's testimony at the April 1998 hearing and the evidence regarding the information he obtained from Dr. Morgan in May 1998 disposes of all of Plaintiff's claims as a matter of law without further need for discovery.

### E. Plaintiff's Motion for Leave to File Second Amended Complaint (Doc. 204)

Plaintiff moves for leave to file a second amended complaint. Plaintiff's primary purpose in moving for leave to amend is to add a direct liability medical malpractice claim against GMED for negligence in the creation, management, retention, and maintenance of Plaintiff's medical records. Plaintiff's proposed second amended complaint also deletes the claim against and references to Dr. Klonis, deletes the two vicarious liability claims against GMED, and adds additional allegations against Dr. Val–Mejias.

Leave to amend "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). This is a "mandate ... to be heeded." *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). Leave to amend is a matter committed to the court's sound discretion and is not to be denied without the court giving some reason or cause on the record. *Fed. Ins. Co. v. Gates Learjet Corp.*, 823 F.2d 383, 387 (10th Cir.1987) (citations omitted). Leave may be denied when the amendment would cause undue prejudice to the opposing party, when the movant has "unduly and inexplicably delayed" in requesting leave, when the movant acts on a "bad faith or dilatory motive," or when the amendment would be futile. *Foman*, 371 U.S. at 182, 83 S.Ct. 227; *State Distribs., Inc. v. Glenmore Distilleries Co.*, 738 F.2d 405, 416 (10th Cir. 1984) (citation omitted). In exercising discretion, the court is mindful that the Federal Rules of Civil Procedure are designed to facilitate decisions on the merits rather than on pleading technicalities. *Koch v. Koch Indus.*, 127 F.R.D. 206, 209 (D.Kan. 1989) (citations omitted).

■ The court concludes that Plaintiff's motion for leave to file a second amended complaint must be denied as futile. As noted, the primary amendment proposed by Plaintiff is the direct liability medical malpractice claim against GMED. Although the proposed claim concerns negligence in the creation, management, retention, and maintenance of Plaintiff's medical records, the alleged injury to Plaintiff is the same as the injury he alleges to have

suffered as a result of Dr. Val–Mejias's negligent medical care, namely, the physical problems he experienced as a result of his pacemaker. Because the court has already concluded that the fact of his injury was reasonably ascertainable to Plaintiff more than two years before he filed suit, Plaintiff's direct liability medical malpractice claim against GMED would be barred by the statute of limitations and is, therefore, futile. Because Plaintiff's claim against GMED is futile, and because the remainder of the proposed changes in Plaintiff's second amended complaint have no effect on the court's decisions in this opinion, the court denies Plaintiff's motion for leave to file a second amended complaint.

### F. Plaintiff's Motion to Disqualify Defense Counsel (Doc. 183)

Plaintiff moves to disqualify defense counsel in this case for an alleged conflict of interest in representing Dr. Val–Mejias and GMED, as well as Dr. Boxberger, a GMED physician against whom Defendants have represented that they will attempt to attribute fault to should the case proceed to trial. Because all of Plaintiff's claims have been dismissed, the court denies Plaintiff's motion as moot.

IT IS, THEREFORE, BY THE COURT ORDERED that GMED's motion to dismiss (Doc. 23) is granted, GMED's motion for Rule 11 sanctions (Doc. 26) is denied, GMED's first motion for summary judgment (Doc. 169) is denied as moot, Plaintiff's motion to disqualify defense counsel (Doc. 183) is denied as moot, Plaintiff's motion for leave to file a second amended complaint (Doc. 204) is denied, and Dr. Val–Mejias's first and GMED's second motion for summary judgment

(Doc. 212) is granted in part and denied as moot in part.

The case is closed, and the Clerk shall enter judgment for Defendants.

Copies of this order shall be transmitted to counsel of record for the parties.

**IT IS SO ORDERED.**